**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GERALD K. KEEHN,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:19-cv-00391** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **DEPUTY GEORGE MILLER, <u>et al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the Court is the motion for summary judgment (Doc. No. 34) filed by Defendants George Miller ("Miller"), Officer Harris ("Harris"), Officer Garcia ("Garcia"), Lieutenant Gandy ("Gandy"), Officer Fiske ("Fiske"), and Officer Tillman ("Tillman"). The motion is fully briefed and ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion.

## I.    BACKGROUND

Plaintiff initiated the above-captioned action on February 27, 2019, while incarcerated at the State Correctional Institution in Dallas, Pennsylvania ("SCI Dallas"), by filing a complaint against Defendants Miller, Harris, Garcia, Gandy, Fiske, Tillman, Sergeant Mac ("Mac"), and three (3) John Doe individuals pursuant to 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 2.) Plaintiff asserts that the following events giving rise to his claims occurred from October 20, 2018 through January 22, 2019. (<u>Id.</u> at 22.) He alleges that during his incarceration at SCI Dallas, he asked the corrections officers not to open his cell unless he or his cellmate was present. (<u>Id.</u> at 2.) At some point, Plaintiff's "cell was robbed." (<u>Id.</u>) Plaintiff's sister called and spoke to security staff at SCI Dallas, and Plaintiff "was told by gang members [that] COs told them [he] was a [pedophile] and [he] had to pay taxes." (<u>Id.</u>)

Plaintiff alleges that he told Defendant Gandy that he feared for his life and that Defendant

Gandy responded that SCI Dallas does not place inmates in protective custody ("P.C.").  (Id.)

Defendant Gandy took Plaintiff to see Lieutenant John Doe, who told Plaintiff that he would help

him if Plaintiff provided information about inmates who possessed drugs or cell phones.  (Id. at 2-

3.)  John Doe also told Plaintiff that his other choices were to "fight, f***, [or] refuse to lock in."

(Id. at 3.)  Plaintiff ultimately chose to refuse to "lock in" to his cell and was sent to the Restricted

Housing Unit ("RHU").  (Id.)  Plaintiff was subsequently sent back to D Block, where he

maintains Defendants Mac, Harris, and Garcia "made it a point to tell inmates [his] charges."

(Id.)  An inmate named Michael Mclintock ("Mclintock") came to Plaintiff's cell and directed

Plaintiff to order him a list of items "or else."  (Id.)  After Plaintiff's cell door was opened,

Mclintock slammed Plaintiff against the wall, held a sharp object against Plaintiff's head, and

threatened to rape Plaintiff if Plaintiff did not order the items.  (Id.)

Plaintiff reported the assault to Defendant Harris, who stated that "he didn't see anything."

(Id. at 4.)  Defendant Harris refused to call security and told Plaintiff to "get off his block."  (Id.)

Plaintiff refused to "lock in" and was sent to "the hole," i.e., segregation.  (Id.)  While there, he

provided a statement that he had been sexually assaulted.  (Id.)  Subsequently, Plaintiff was

beaten in his cell by an inmate who "said he was maxing out in 16 days and Mclintock told him to

get [Plaintiff]."  (Id.)  In addition, other inmates beat and robbed Plaintiff while Defendant

Tillman stood by.  (Id.)  Plaintiff maintains that he was ultimately placed in P.C. with the same

inmates who sexually assaulted him.  (Id.)  Based on these events, Plaintiff asserts that

Defendants failed to protect him from assault in violation of the Eighth Amendment and violated

his equal protection rights under the Fourteenth Amendment.  (Id. at 10.)  Plaintiff requests

damages and a transfer from SCI Dallas.[1]

In an Order dated March 1, 2019, the United States District Court for the Eastern District

of Pennsylvania transferred the above-captioned case to this Court for further proceedings.  (Doc.

No. 5.)  In an Order dated April 19, 2019, the Court granted Plaintiff leave to proceed in forma

pauperis and directed service of his complaint upon Defendants.  (Doc. No. 13.)  On June 18,

2019, Defendants Fiske, Gandy, Garcia, Harris, Miller, and Tillman filed a motion for a more

definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.  (Doc. No. 19.)

In an Order dated August 15, 2019, the Court denied the motion for a more definite statement

(Doc. No. 25), and Defendants Fiske, Gandy, Garcia, Harris, Miller, and Tillman filed their

answer to the complaint (Doc. No. 25) on September 12, 2019.  In an Order dated March 13,

2020, the Court directed Plaintiff to show cause why Defendant Mac and the three (3) John Does

should not be dismissed from the above-captioned case pursuant to Rule 4(m) of the Federal

Rules of Civil Procedure.  Plaintiff did not respond to the Court's Order.  Accordingly, in an

Order dated April 3, 2020, the Court dismissed Defendant Mac and the three (3) John Does

without prejudice from this action.  (Doc. No. 33.)

Defendants Fiske, Gandy, Garcia, Harris, Miller, and Tillman filed their motion for

summary judgment (Doc. No. 34) and supporting materials (Doc. Nos. 35, 36) on May 27, 2020.

On May 27, 2020, observing that Defendants raised the issue of whether Plaintiff properly

---

[1] A review of the docket in the above-captioned case indicates that Plaintiff is no longer incarcerated at SCI Dallas and is presently confined at SCI Frackville.  Plaintiff's transfer, therefore, renders his claim for injunctive relief moot.  See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003) (noting that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims").

exhausted his administrative remedies with respect to his claims in accordance with the Prison

Litigation Reform Act ("PLRA"), the Court issued a <u>Paladino</u> Order informing the parties that it

would consider the exhaustion issue in the context of summary judgment and, by doing so, would

consider matters outside the pleadings in its role as factfinder.[2]  (Doc. No. 37.)  The Court

directed Plaintiff to file a brief in opposition addressing the issue of administrative exhaustion and

a statement of material facts responding to Defendants' statement within thirty (30) days.  (<u>Id.</u>)

Plaintiff filed his response on June 12, 2020 (Doc. No. 38), and Defendants filed a reply on June

18, 2020 (Doc. Nos. 39).

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  "[T]his standard provides that

the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the

outcome of the case under applicable substantive law.  <u>See</u> <u>id.</u> at 248; <u>Gray v. York Newspapers,</u>

<u>Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>Anderson</u>, 477

U.S. at 257; <u>Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.</u>, 927 F.2d 1283,

1287-88 (3d Cir. 1991).

---

[2] <u>See</u> <u>Paladino v. Newsome</u>, 885 F.3d 203 (3d Cir. 2018).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement

required [to be filed by the movant], as to which it is contended that there exists a genuine issue to

be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to

be served by the moving party will be deemed to be admitted." See L.R. 56.1.  A party cannot

evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se

litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, Civ. No. 09-

1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not

excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ.

No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties

must follow the Federal Rules of Civil Procedure).

## III.     STATEMENT OF MATERIAL FACTS[3]

Plaintiff "is serving a sentence of 11 and a half to 24 years for various child sexual assault

offenses."  (Doc. No. 35 ¶ 1.)  He "was sentenced on May 3, 2018 and served time at SCI-

Graterford and SCI-Camp Hill before he was transferred to SCI Dallas in September 2018."  (Id.

¶ 7.)  Plaintiff "has received regular psychiatric treatment during his confinement and on January

---

[3] The Local Rules provide that in addition to the requirement that a party file a brief in opposition
to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary
judgment shall include a separate, short and concise statement of material facts responding to the
numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as
to which it is contended that there exists a genuine issue to be tried."  See M.D. Pa. L.R. 56. 1.
The Rule further requires the inclusion of references to the parts of the record that support the
statements.  See id.  Finally, the Rule states that the statement of material facts required to be
served by the moving party will be deemed to be admitted unless controverted by the statement
required to be served by the opposing party.  See id.  Unless otherwise noted, the background
herein is derived from Defendants' Rule 56.1 statement of facts.  (Doc. No. 35.)  Despite the
Court's directive (Doc. No. 37), Plaintiff has not filed a response to Defendants' statement of
material facts in compliance with Local Rule 56.1.  Accordingly, the Court deems the facts set
forth by Defendants to be undisputed.  See Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; United
States v. Alberto, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020)
(concluding that the "[f]ailure to file this [responsive statement of material facts] results in
admission of the moving party's statement of facts").

3, 2019 a prison psychiatrist concluded that Plaintiff 'is not forthcoming, has little empathy for others, and is likely manipulative.'"  (Id. ¶ 8.)  During the relevant time, Defendant Miller was the Deputy Superintendent of SCI Dallas, Defendants Fiske and Gandy were lieutenants at SCI Dallas, and Defendants Tillman and Garcia were officers at SCI Dallas.  (Id. ¶¶ 2-6.)

### A.     Events at SCI Dallas

Plaintiff has described SCI Dallas as being a "hard prison" and stated that he began "having issues" with staff shortly after his arrival there in September of 2018.  (Id. ¶¶ 9-10.)  On December 14, 2018, Plaintiff told a prison psychiatrist "that he '[f]eels that he is being harassed by [a] CO due to his [criminal] case.'"  (Id. ¶ 11.)  He "also '[s]tate[d] that he stays to himself and doesn't know why this is happening.'"  (Id.)  On January 9, 2019, Plaintiff told a different psychiatrist "that 'he doesn't like to leave [his] cell because he feels the COs want to get him in trouble.  He further relate[d] he doesn't get along with the COs on his block.'"  (Id. ¶ 12.)

### 1.     Incident on J Block

On October 31, 2018, while waiting in line for the showers, Plaintiff observed three (3) or four (4) Hispanic inmates enter his cell on J Block.  (Id. ¶ 13.)  Plaintiff returned to his cell to see what they were doing.  (Id. ¶ 14.)  He noticed that certain commissary items, a radio, and his CDs were missing.  (Id. ¶ 15.)  One of the Hispanic inmates grabbed Plaintiff, put him against a wall, and threatened him.  (Id.)  Plaintiff "was unable to describe his purported assailants, other than that they were Hispanic and 'had tattoos all over their faces.'"  (Id. ¶ 16.)

That evening, while on his way to dinner, Plaintiff approached Defendant Gandy and told him about the robbery from his cell.  (Id. ¶ 17.)  Plaintiff asked Defendant Gandy to place him in P.C., and Defendant Gandy responded that "Dallas doesn't offer P.C."  (Id.)  Defendant Gandy "escorted Plaintiff to security so that Plaintiff could make a report."  (Id. ¶ 18.)  After making a

report, Plaintiff "'refused to lock in to his cell' so that he could receive a misconduct and be placed in the [RHU] away from J Block." (Id. ¶ 19.)  Plaintiff was issued a misconduct for refusing to obey an order and was placed in the RHU after receiving the misconduct.  (Id. ¶¶ 20-21.)  He pled guilty to the misconduct at a disciplinary hearing held on November 2, 2018.  (Id. ¶ 20.)

### 2.      Incident on D Block

Plaintiff was released from the RHU on November 16, 2018, at which time he was "transferred to D Block in a different area in the general prison population."  (Id. ¶ 22.)  While housed on D Block, Plaintiff had several interactions "with an inmate that others referred to as 'Hammer.'"  (Id. ¶ 23.)  "Plaintiff had not encountered Hammer prior to November 26, 2018." (Id. ¶ 24.)  On December 23, 2018, Hammer entered Plaintiff's cell, threw him against a wall, and held a sharp object to the back of his head.  (Id. ¶ 25.)  Plaintiff was not physically injured but claimed that Hammer smacked his "bottom" over his clothing during the incident.  (Id. ¶¶ 26-27.) Plaintiff reported the incident to Defendant Garcia, who made a report to prison security.  (Id. ¶ 28.)  After the report, Plaintiff refused to lock into his cell and was taken to the RHU.  (Id. ¶ 29.) Plaintiff "explained to medical staff at that time that he was in the RHU because 'he feels safer in the RHU' and that 'he refused [to] lock up so he can be sent to the RHU.'"  (Id. ¶ 30.)

### 3.      Incident on M Block

Plaintiff was released from the RHU on January 9, 2019, at which time he was "transferred to M Block in yet another area of the prison."  (Id. ¶ 31.)  A week or two later, three inmates entered Plaintiff's cell and "jumped" him.  (Id. ¶ 32.)  Plaintiff "did not know the identity of his assailants" but referred to one of them as "Blaze."  (Id. ¶¶ 33-34.)  Defendant Tillman "broke up the altercation and sent Plaintiff to the medical department."  (Id. ¶ 35.)  Medical staff

assessed that Plaintiff sustained bruising and swelling on his forehead and right hand.  (<u>Id.</u> ¶ 36.)  Plaintiff told medical staff that he hurt his hand while "punching another inmate in defense."  (<u>Id.</u> ¶ 37.)

On January 24, 2019, Plaintiff received an X-ray that "'fail[ed] to demonstrate evidence of an acute fracture, radiopaque foreign body, or tissue deformity.'"  (<u>Id.</u> ¶ 38.)  On January 30, 2019, however, Plaintiff told medical staff that he had fallen a day earlier and that "when he 'put [his] right hand out' as a '[r]eaction to catch [himself],' he 'felt something pop.'"  (<u>Id.</u> ¶ 39.)  Plaintiff had another X-ray on January 31, 2019, which "showed a '[r]elatively nondisplaced fracture involving the proximal metaphyseal region of the fifth metacarpal bone.'"  (<u>Id.</u> ¶ 40.)  Plaintiff was housed in the infirmary at SCI Dallas from January 23-28, 2019.  (<u>Id.</u> ¶ 41.)  He was then placed in the RHU from January 29, 2019 until he was transferred to SCI Frackville on February 28, 2019.  (<u>Id.</u> ¶ 42.)

### B.      Administrative Exhaustion

On November 6, 2018, Plaintiff "submitted grievance 771510 concerning the October 31, 2018 incident on J Block."  (<u>Id.</u> ¶ 43.)  He submitted "grievance 782204 concerning the December 23, 2018 incident on D Block on January 12, 2019."  (<u>Id.</u> ¶ 44.)  Finally, "Plaintiff submitted grievance 785215 concerning the January 2019 incident on M Block on February 2, 2019."  (<u>Id.</u> ¶ 45.)  Plaintiff's grievances "are being handled pursuant to the procedures set forth in DCM 008[,] Prison Rape Elimination Act ('PREA')."  (<u>Id.</u> ¶ 46.)  "In particular, Plaintiff's allegations are being investigated by the Pennsylvania Department of Corrections Bureau of Investigation and Intelligence ('BII')."  (<u>Id.</u> ¶ 47.)  Because of the nature of Plaintiff's allegations, "the investigation was referred to the Pennsylvania State Police ('PSP')."  (<u>Id.</u> ¶ 48.)  The PSP has not yet completed its investigation "and BII's investigation is on hold pending the outcome of the

PSP investigation."  (Id. ¶ 49.)  After PSP completes its investigation, "BII will review the

findings of PSP to make sure the investigation was completed in a satisfactory manner."  (Id.

¶ 50.)  BII "will then inform the relevant individuals of its findings."  (Id. ¶ 51.)

## IV.  DISCUSSION

Defendants maintain that they are entitled to summary judgment because: (1) Plaintiff

failed to exhaust his available administrative remedies, as required by the PLRA, before filing the

above-captioned case, and (2) Plaintiff cannot maintain his Eighth Amendment failure to protect

claim against them.[4]  (Doc. No. 36 at 7.)  The Court considers Defendants' arguments in turn.

---

[4] As noted supra, Plaintiff also asserts a violation of his equal protection rights under the
Fourteenth Amendment.  Defendants argue that "the Fourteenth Amendment is not applicable
given the nature of Plaintiff's allegations."  (Doc. No. 36 at 1 n.1.)  Defendants cite Albright v.
Oliver, 510 U.S. 266, 273 (1994), for the proposition that "[w]here a particular Amendment
provides an explicit textual source of constitutional protection against a particular sort of
government behavior, that Amendment, not the more generalized notion of 'substantive due
process,' must be the guide for analyzing these claims."  (Id.)  Plaintiff, however, has not asserted
a substantive due process claim in the above-captioned case.
    The Equal Protection Clause requires state actors to treat all persons who are "similarly
situated" equally.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).
Traditionally, "[i]n order to establish a prima facie case of discrimination under the Equal
Protection Clause, [plaintiffs] need[] to prove that they were members of a protected class [such
as race or gender] and that they received different treatment than that received by similarly-
situated individuals."  See Oliveira v. Twp. of Irvington, 41 F. App'x 555, 559 (3d Cir. 2002).
However, where a plaintiff alleges that he alone "has been intentionally treated differently from
others similarly situated and that there is no rational basis for the difference in treatment," he may
raise a "class of one" equal protection claim.  See Enquist v. Or. Dep't of Agric., 553 U.S. 591,
598 (2008).  To maintain such a claim, a plaintiff must establish that he has been irrationally
singled out for disparate treatment.  See id.  "[A]t the very least, to state a claim under [a class of
one theory], a plaintiff must allege that (1) the defendant treated him differently from others
similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the
difference in treatment."  Mosca v. Cole, 217 F. App'x 158, 164 (3d Cir. 2007).  When alleging
the existence of similarly situated individuals, plaintiffs "cannot use allegations . . . that amount to
nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief,"
and "bald assertion[s] that other[s] . . . were treated in a dissimilar manner" will not suffice.  See
Young v. New Sewickley Twp., 160 F. App'x 263, 266 (3d Cir. 2005) (citing Evancho v. Fisher,
423 F.3d 347, 353 (3d Cir. 2005)).
    In the instant case, Plaintiff suggests that he was discriminated against because of his
conviction as a sex offender.  (Doc. No. 2 at 10.)  Sex offenders, however, are not a suspect class

A.      **Exhaustion of Administrative Remedies**

Pursuant to the PLRA, a prisoner must pursue all available avenues of relief through the

applicable grievance system before initiating a federal civil rights action.  See 42 U.S.C.

§ 1997e(a); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust

irrespective of the forms of relief sought and offered through administrative avenues.").  Section

1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison

conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative remedies as are available

are exhausted."  See 42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  See

Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 742 (holding

that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the

relief offered through administrative procedures").

The United States Court of Appeals for the Third Circuit has stated that there is no futility

exception to Section 1997e's exhaustion requirement.  See Nyhuis v. Reno, 204 F.3d 65, 75-76

(3d Cir. 2000).  Courts have typically required across-the-board exhaustion by inmates seeking to

pursue claims in federal court.  See id.  Additionally, courts have interpreted this exhaustion

requirement as including a procedural default component, holding that inmates must fully satisfy

the administrative requirements of the inmate grievance process before proceeding with a claim in

federal court.  See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); see also Oriakhi v. United States,

---

for purposes of the Equal Protection Clause.  See Smith v. Fischer, No. 07-1264, 2009 WL
632890, at *10 n.29 (N.D.N.Y. Mar. 9, 2009).  In any event, Plaintiff has not presented any
evidence suggesting that Defendants intentionally treated Plaintiff differently from others
convicted of sex offenses or treated other inmates more favorably in any respect.  Plaintiff's
allegations that his equal protection rights were violated are simply "bald assertions" that fail to
allege "occasions and circumstances" of different treatment.  See Young, 160 F. App'x at 266.

165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court").  Courts have also concluded that inmates who fail to complete the prison grievance process in a full and timely manner are barred from subsequently litigating claims in federal court.  See, e.g., Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000).

This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement.  See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).  However, courts also recognize a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires."  See Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," see Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate."  See Warman, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials or other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently decline to excuse inmates' failures to exhaust.  An inmate, therefore, may not excuse a failure to comply with these grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement.  See Harris, 149 F. App'x at 59.  Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not

clearly explained to him.  See Warman, 49 F. App'x at 368.  Consequently, an inmate's confusion

regarding these grievances procedures does not, alone, excuse a failure to exhaust.  See Casey v.

Smith, 71 F. App'x 916 (3d Cir. 2003); see also Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir.

2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated pro se

petitioner, generally does not excuse prompt filing.'" (citations omitted)).

　　　　Recently, the Supreme Court considered what renders administrative remedies unavailable

to an inmate such that a failure to exhaust may be excused.  See Ross v. Blake, 136 S. Ct. 1850

(2016).  The Court noted "three kinds of circumstances in which an administrative remedy,

although officially on the books, is not capable of use to obtain relief."  See id. at 1859.  First, an

administrative procedure is not available "when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved inmates."  See id.  Second, a procedure is not available when it is

"so opaque that it becomes, practically speaking, incapable of use."  See id.  Finally, a procedure

is unavailable when "prison administrators thwart inmates from taking advantage of a grievance

process through machination, misinterpretation, or intimidation."  See id. at 1860.  However,

"once the defendant has established that the inmate failed to resort to administrative remedies, the

onus falls on the inmate to show that such remedies were unavailable to him."  See Rinaldi v.

United States, 904 F.3d 257, 268 (3d Cir. 2018).  The Third Circuit recently established that:

> to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff,
> an inmate must show (1) that the misrepresentation is one which a reasonable
> inmate would be entitled to rely on and sufficiently misleading to interfere with a
> reasonable inmate's use of the grievance process, and (2) that the inmate was
> actually misled by the misrepresentation.

Hardy v. Shaikh, 959 F.3d 578, 588 (3d Cir. 2020).

In the instant case, Defendants argue that Plaintiff failed to exhaust his administrative remedies properly. (Doc. No. 36 at 8-10.) Specifically, they maintain that Plaintiff's allegations are subject to the procedures set forth in DC-ADM 008 because they concern at least one purported incident of sexual abuse, and that Plaintiff commenced the above-captioned case prior to exhausting the remedies set forth therein fully. (Id. at 9-10.) In support of this argument, Defendants have submitted Plaintiff's deposition, copies of Plaintiff's grievances, a copy of DC-ADM 008, and affidavits. (Doc. Nos. 35-1, 35-5, 35-6, 35-7.)

DC-ADM 008 provides that:

> Inmates shall not utilize the inmate grievance system to report sexual abuse or sexual harassment by a staff member or inmate-on-inmate sexual abuse, as defined in the Glossary of Terms for this procedures manual. However, if an inmate files a grievance related to staff on inmate sexual abuse/sexual harassment or inmate on inmate sexual abuse, the Facility Grievance Coordinator shall reject the grievance and forward it to the facility Security Office and PREA Compliance Manager (PCM)/designee for tracking and investigation. The inmate shall be notified of this action.

(Doc. No. 35-6 at 44-45) (emphasis omitted). In the instant case, the record reflects that Plaintiff submitted his three (3) grievances pursuant to DC-ADM 804, which sets forth the Department of Corrections' general grievance policy. (Doc. No. 35-5.) The facility grievance coordinator rejected each grievance because they involved allegations of a sexual nature to be handled pursuant to DC-ADM 008. (Id.) Plaintiff's grievances were forwarded to the Security Department and the PREA Compliance Manager at SCI Dallas to begin an investigation. (Id.)

DC-ADM 008 provides that allegations of sexual abuse are investigated by the facility's Security Office. Immediately after the preliminary investigation, the facility Security Office must "update the PREA Tracking System with all pertinent investigative information in order to determine whether the complaint meets the criteria of sexual abuse or sexual harassment as defined by the PREA Prisons and Jail Standards (28 C.F.R. § 115)." (Doc. No. 35-6 at 61.) The

facility Security Office almost must report all sexual abuse and harassment allegations to the BII.

(Id.)  Within five (5) business days, the BII must assign a case number and "determine the entity

(i.e, [BII], Pennsylvania State Police [PSP], or Security Office) to conduct the investigation."

(Id.)  BII is also responsible for "track[ing] the start date of the investigation, end date of the

investigation, assigned investigating agent, alleged victim, alleged abuser, and outcome of the

investigation."  (Id.)  With respect to complaints investigated by the PSP or another outside law

enforcement agency, the facility Security Office is responsible for the following: (1) "ensur[ing]

follow-up communication with the investigating agency for updates to the investigative process";

(2) "request[ing] a copy of the investigative information to be included in the Department

Investigative file"; (3) "request[ing] notification of the outcome of the investigation in order to

notify the inmate"; (4) "submi[tting] an investigative summary, along with the PSP investigative

report, to the [BII] for review"; and (5) "ensur[ing] the PREA Tracking System is updated with

the status of investigative outcome."  (Id. at 66.)  "The Department of Corrections' determinations

with regard to an inmate's PREA complaint are 'akin to the final appeal decision of a grievance.'"

See Ricciardi v. Shumencky, No. 1:17-cv-719, 2018 WL 1251834, at *5 (M.D. Pa. Mar. 12,

2018) (quoting Tillman v. Pa. Dep't of Corr., No. 327 M.D. 2016, 2017 WL 2536456, at *3 (Pa.

Cmwlth. Ct. June 9, 2017)).

In the instant case, as noted previously, the record reflects that the BII has an open

investigation into Plaintiff's allegations and that the investigation was referred to the PSP.  (Doc.

No. 35-6 at 2-3.)  The PSP has not yet completed its investigation; therefore, the BII's

investigation is "on hold pending completion of the PSP investigation."  (Id. at 3.)  Once the PSP

completes its investigation, the findings will be reviewed by the BII and the relevant individuals

will be informed of those findings.  (Id.)  In response to Defendants' motion for summary

judgment, Plaintiff contends that the investigation into his allegations has been pending for over a year and he has yet to be interviewed.  (Doc. No. 38 at 2-4.)  He maintains that "[t]he DOC has policies to follow and nothing is being done.  [The] State Police ha[ve] failed to investigate a crime."  (Id. at 3.)  Plaintiff, therefore, acknowledges that the PREA investigation is currently ongoing.

Failure to exhaust is an affirmative defense; accordingly, Defendants have the burden of demonstrating that Plaintiff failed to exhaust his administrative remedies prior to initiating the above-captioned case.  See Small v. Camden Cty., 728 F.3d 265, 268 (3d Cir. 2013).  In the instant case, the Court cannot find that Defendants have satisfied their burden where the record is unclear that all of Plaintiff's claims fall within the ambit of referral for investigation pursuant to DC-ADM 008.  The Western District of Pennsylvania has recognized that it is unclear whether legal claims that are corollary to a sexual assault should be exhausted through DC-ADM 804, the DOC's general grievance procedure, or through DC-ADM 008, the DOC's PREA procedures. See Sarvey v. Wetzel, No. No. 16-157ERIE, 2018 WL 1519072, at *3 (W.D. Pa. Mar. 28, 2018). Moreover, courts within the Third Circuit have noted that it may be possible for an inmate to exhaust claims of abuse by filing a grievance pursuant to the procedures set forth in DC-ADM 001, the DOC's policy regarding inmate abuse.  See Washington v. Sedlock, No. 17-988, 2020 WL 4353198, at *6 (W.D. Pa. May 12, 2020).  In the instant case, Plaintiff raises claims that appear to be corollary to the sexual assault he alleges he experienced, but Defendants have cited no evidence indicating why all of Plaintiff's claims were deemed to be PREA complaints and, therefore, referred for investigation under DC-ADM 008.  As such, Defendants have failed to satisfy their burden of demonstrating that the procedures set forth in DC-ADM 008 encompass all claims Plaintiff raises in his complaint.

The Court also cannot find that Defendants have satisfied their burden where the record is unclear whether SCI Dallas has satisfied its obligations under DC-ADM 008. The Third Circuit has recently held that the PLRA "requires strict compliance by prison officials with their own policies. Whenever a prison fails to abide by those procedural rules, its administrative remedies have become unavailable, and inmates are deemed to have successfully exhausted their remedies for purposes of the PLRA." See Shifflett v. Korszniak, 934 F.3d 356, 367 (3d Cir. 2019). Defendants have not provided any evidence indicating that SCI Dallas's Security Office has abided by the procedural rules set forth in DC-ADM 008 by "ensur[ing] follow-up communication with the [PSP] for updates to the investigative process." (Doc. No. 35-6 at 66.) As noted above, Plaintiff's PREA complaints were referred to the PSP for investigation over a year ago, and he has yet to be interviewed. While DC-ADM 008 sets forth no timeline as to how long an investigation into an inmate's PREA complaint should last, the Court concludes that such an investigation cannot be allowed to languish indefinitely. By failing to demonstrate that the Security Office has followed up with the PSP regarding Plaintiff's PREA complaint, Defendants have failed to show that the remedies set forth in DC-ADM 008 were available to Plaintiff. See Shifflett, 934 F.3d at 367. Accordingly, because Defendants have failed to meet their burden, the Court declines to grant them summary judgment on the basis that Plaintiff did not properly exhaust his administrative remedies prior to initiating the above-captioned case.

**B.      Merits of Plaintiff's Eighth Amendment Claim**

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." See Farmer v. Brennan, 511 U.S. 825, 833 (1994). While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another implicates liability for

the officials responsible for that inmate's safety. See id. at 833-34. Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." See Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837). This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." See id.; see also Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997). Actual knowledge may be proven circumstantially in situations where the general danger was obvious. See Farmer, 511 U.S. at 842. For example, if the prisoner:

> presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

Id. at 842-43 (quotation omitted). However, "a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." See Beers-Capitol, 256 F.3d at 133.

Defendants argue that Plaintiff cannot maintain his Eighth Amendment claim as a matter of law because: (1) they acted reasonably by moving him to other housing areas after he raised his concerns; and (2) they were not personally involved in any of the alleged wrongs. (Doc. No. 36 at 10-15.) Upon review of the record, the Court agrees with Defendants for the reasons discussed below.

### 1.    Defendant Fiske

Plaintiff alleges that after he was transferred to D Block, he told Defendant Fiske that he

felt that his life was in danger.  (Doc. No. 2 at 6.)  In his deposition, Plaintiff averred that he told

Defendant Fiske that Defendant John Doe told him to "fight, f***, or refuse to lock up."  (Doc.

No. 35-1 at 113.)  Plaintiff maintains that Defendant Fiske told him that he would look into the

situation.  (Id.)  Plaintiff further alleges that Defendant Fiske gave him "the brush off" when

Plaintiff told him that he "really [did not] feel safe out in population" in D Block.  (Id. at 113-14.)

Although Plaintiff was sexually assaulted by "Hammer" after his transfer to D Block, Plaintiff has

presented no evidence that Defendant Fiske was aware that "Hammer" or any other inmate on D

Block posed a significant risk to Plaintiff's safety.  See Bracey v. Pa. Dep't of Corr., 571 F.

App'x 75, 79 n.3 (3d Cir. 2014) (concluding that summary judgment was proper on an Eighth

Amendment failure to protect claim because it was undisputed that "there was no prior tension

between [the plaintiff] and his assailants, and [the plaintiff] did not allege that those assailants had

a history of assaulting other inmates"); Rivera v. Josephwicz, No. 3:14-cv-319, 2017 WL

3015885, at *5 (M.D. Pa. July 13, 2017) (concluding that summary judgment was appropriate

because the inmate-plaintiff failed to present evidence "in support of his claim that staff failed to

protect him from an assault and knew or should have known that [the assailant] would assault

him"); cf. Smith v. Donate, No. 4:10-cv-2133, 2012 WL 3537017, at *10 (M.D. Pa. June 15,

2012) (noting that "a mere generalized knowledge that prisons are dangerous places does not give

rise to an Eighth Amendment claim"), report and recommendation adopted, 2012 WL 3537008

(M.D. Pa. Aug. 15, 2012).  Accordingly, Defendant Fiske is entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim.[5]

## 2.    Defendant Tillman

In his complaint, Plaintiff alleges that during the incident that occurred on M Block, Defendant Tillman "stood [there]" while two (2) inmates robbed Plaintiff's cell and two (2) other inmates beat him.  (Doc. No. 2 at 4.)  Plaintiff's complaint, however, is unsworn and, therefore, may not be treated as an affidavit in opposition to Defendants' motion for summary judgment. See Ziegler v. Eby, 77 F. App'x 117, 120 (3d Cir. 2003) (noting that "the complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)").  Rather, the record before the Court reflects that Defendant Tillman is the officer who told the inmates to stop and broke up the fight between them and Plaintiff.  (Doc. No. 35-1 at 118.)  Defendant Tillman also sent Plaintiff to the medical department.  (Id.)  Plaintiff has cited no evidence suggesting that Defendant Tillman knew that these inmates posed a risk to Plaintiff's safety and chose to disregard that risk.  See Beers-Capitol,

---

[5] In his response to Defendants' motion for summary judgment, Plaintiff appears to assert that Defendant Fiske is the officer who told him to "fight, f***, or refuse to lock up." (Doc. No. 38 at 1.) Plaintiff's sworn testimony during his deposition—during which Plaintiff testified repeatedly that Defendant John Doe is the one who made that statement—contradicts this assertion, however. (Doc. No. 35-1 at 86, 111.) Plaintiff cannot rely upon an unsworn conflicting allegation in his response to create a material issue of fact for purposes of defeating summary judgment. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (noting that a "sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment" and that a "sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant"); see also Coit v. Garman, No. 19-2580, 2020 WL 2125780, at *3 (3d Cir. May 5, 2020) (citing Jiminez and concluding that the omission of a "key complaint allegation from both [the inmate-plaintiff's] deposition testimony and his filings in response to the summary judgment motion . . . to effectively be a sham affidavit" to which "no reasonable jury could afford [] evidentiary weight").

256 F.3d at 133.  Rather, the record reflects that Defendant Tillman "respond[ed] reasonably to a risk to [Plaintiff's] safety."  See Hamilton, 117 F.3d at 748.  The Court, therefore, will grant summary judgment to Defendant Tillman with respect to Plaintiff's Eighth Amendment claim.

### 3.      Defendant Gandy

With respect to Defendant Gandy, Plaintiff alleges that on October 31, 2018, he told Defendant Gandy that his cell on J Block had been robbed.  (Doc. No. 2 at 2.)  Plaintiff asked Defendant Gandy to place him P.C., and Defendant Gandy replied that SCI Dallas did not offer P.C.  (Id.)  Defendant Gandy then took Plaintiff to the security office to make a report.  (Id. at 2-3.)  Plaintiff, however, has presented no evidence that Defendant Gandy was aware that the Hispanic inmates who robbed his cell and threatened him or any other inmate on J Block posed a significant risk to Plaintiff's safety.  See Bracey, 571 F. App'x at 79 n.3; Rivera, 2017 WL 3015885, at *5.  Rather, the record reflects that Defendant Gandy "respond[ed] reasonably to a risk to [Plaintiff's] safety" by taking him to the security office to make a report and ensuring that he was not returned to J Block.  See Hamilton, 117 F.3d at 748.  The Court, therefore, will grant summary judgment to Defendant Gandy with respect to Plaintiff's Eighth Amendment claim.

### 4.      Defendants Garcia and Harris

In his complaint, Plaintiff alleges that Defendants Garcia and Harris made a point of telling other inmates at SCI Dallas about Plaintiff's convictions for sex offenses.  (Doc. No. 2 at 3.)  Plaintiff maintains further that after he was assaulted by "Hammer," he reported the assault to Defendant Harris, who told him that he would be moved only if he refused to lock in.  (Id. at 4.) This Court has "recognized that labeling an inmate a child molester 'may give rise to an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate.'"  See Horan v. Collins, No. 1:13-cv-140, 2016 WL 5030468, at

*16 (M.D. Pa. Aug. 8, 2016) (quoting Tabb v. Hannah, No. 1:10-cv-1122, 2012 WL 3113856, at

*6 (M.D. Pa. July 30, 2012)), report and recommendation adopted, 2016 WL 5033234 (M.D. Pa.

Sept. 19, 2016); see also Renchenski v. Williams, 622 F.3d 315, 326 (3d Cir. 2010) (noting that

"[i]t is largely without question . . . that the sex offender label severely stigmatizes an individual,

and that a prisoner labeled as a sex offender faces unique challenges in the prison environment").

Plaintiff, however, "has produced no documentary evidence to substantiate his allegations

that [Defendants Garcia and Harris] referred to him as a child molester [or sex offender] in the

presence of other inmates."  See Horan, 2016 WL 5030468, at *17.  During his deposition,

Plaintiff averred that he was not present when these remarks were purportedly made but was

instead relying on what other inmates told him.  (Doc. No. 35-1 at 92-95, 105-09.)  Moreover, in

grievance 782204, Plaintiff stated that other inmates had mentioned that Defendants Garcia and

Harris were talking about his case.  (Doc. No. 35-5 at 6.)  However, when considering a motion

for summary judgment, the Court may not consider evidence that would be inadmissible at trial.

See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion

must . .  set out facts that would be admissible in evidence. . . ."); see also Pamintuan v. Nanticoke

Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that "it is not proper" to consider

evidence that would not be admissible at trial for purposes of summary judgment).  Plaintiff's

reliance "on other inmates' accounts of what Defendants [Garcia and Harris] allegedly said, in the

absence of testimony from those inmates, constitutes inadmissible hearsay, and thus, cannot be

used to defeat an otherwise properly supported motion for summary judgment."  See Horan, 2016

WL 5030468, at *17; see also Bristol v. Settle, 457 F. App'x 202, 204 (3d Cir. 2012) ("[Plaintiff]

seeks to rely on his own assertion that [defendant] told other, unidentified inmates . . . that

[plaintiff's] cellmate was a child molester.  But [plaintiff] acknowledged at his deposition that he

was not present when those remarks were allegedly made . . . .  The [d]istrict [c]ourt properly held that [plaintiff's] testimony about what [defendant] said . . . outside of [plaintiff's] presence would be inadmissible at trial and, therefore, does not create a genuine issue of material fact.").

Moreover, the record reflects that Plaintiff reported the assault by "Hammer" to Defendant Garcia, rather than Defendant Harris.  In his deposition, Plaintiff averred that after the assault, Defendant Garcia called security, and security said that Plaintiff had to refuse to lock in to be moved from D Block.  (Doc. No. 35-1 at 62.)  Plaintiff, however, has presented no evidence that Defendant Garcia was aware that "Hammer" posed a significant risk to Plaintiff's safety before the assault occurred.  See Bracy, 571 F. App'x at 79 n.3; Rivera, 2017 WL 3015885, at *5.  Rather, the record reflects that Defendant Garcia "respond[ed] reasonably to a risk to [Plaintiff's] safety" by calling the security office to make a report and ensuring that he was not returned to J Block.  See Hamilton, 117 F.3d at 748.  The Court, therefore, will grant summary judgment to Defendants Harris and Garcia with respect to Plaintiff's Eighth Amendment claim.

### 5.    Defendant Miller

With respect to Defendant Miller, Plaintiff alleges that he failed to oversee staff at SCI Dallas and permitted the alleged Eighth Amendment violations to occur.  (Doc. Nos. 2 at 10, 35-1 at 90.)  Under Section 1983, individual liability may be imposed only if the state actor played an "affirmative part" in the alleged misconduct.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Liability "cannot be predicated solely on the operation of respondeat superior."  See id.  In other words, defendants "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence."  See Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003).

With respect to supervisory liability, there are two theories: "one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." See Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quotation and alteration marks omitted).  As to the second theory, a plaintiff must show that each defendant personally participated in the alleged constitutional violation or approved of it.  See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  With respect to the first theory, "the plaintiff must establish that: (1) existing policy or practice creates an unreasonable risk of constitutional injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."  See Merring v. City of Carbondale, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

In the instant case, Plaintiff suggests that Defendant Miller "failed to remedy the violation of constitutional rights" and "allowed [an] unconstitutional policy" to continue.  (Doc. No. 2 at 10.)  As discussed in detail above, however, Plaintiff has not demonstrated that Defendants Harris, Garcia, Gandy, Fiske, and Tillman violated his Eighth Amendment rights.  It follows, therefore, that Defendant Miller cannot be charged with having knowledge of or acquiescing in any such alleged violations by his subordinates.  See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).  Moreover, Plaintiff fails to provide any evidence of a policy that allegedly caused the violation of his constitutional rights.  See McTernan v. City of

York, 564 F.3d 636, 658 (3d Cir. 2009).  Accordingly, Defendant Miller is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

**V.     CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 34) will be granted.  An appropriate Order follows.